IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BRANDON A. GOODWIN,

Plaintiff,

vs.

KEITH P. HUGHES, M.D. hired surgeon, Individual capacity; KATHRYN SCHULZ, Individual capacity; DR. JEFFREY KASSELMAN, M.D., Individual capacity; JEFFREY A. DAMME, M.D., Individual capacity; and JUVET CHE, M.D., Individual capacity;

Defendants.

**4:19CV3114**

**MEMORANDUM AND ORDER**

This matter is before the Court on the Motion for Summary Judgment, Filing No. 147, filed by Defendants Keith P. Hughes, M.D. ("Dr. Hughes"), and Kathryn Schulz, P.A.-C, ("P.A. Schulz"), and the Motion for Summary Judgment, Filing No. 150, filed by Defendants Dr. Jeffrey Kasselman, M.D. ("Dr. Kasselman"), Jeffrey A. Damme, M.D. ("Dr. Damme"), and Juvet Che, M.D. ("Dr. Che") (collectively "State Defendants").[1] Also before the Court are several motions filed by Plaintiff Brandon A. Goodwin ("Goodwin" or "Plaintiff") in conjunction with his responses to Defendants' summary judgment motions, Filing No. 168; Filing No. 169; Filing No. 170; Filing No. 172; Filing No. 173; Filing No. 174, one motion filed after this case was reassigned to the undersigned, Filing No. 182, and a motion for status, Filing No. 186. Goodwin's motion for status is granted and this Memorandum and Order serves as an update on the status of this case. For the reasons

[1] When it was filed on April 18, 2022, the State Defendants' summary judgment motion also included Defendants Brenda Haith, P.A. C, and Randy Kohl, M.D. Filing No. 150. However, on April 19, 2022, the Court granted Haith's and Kohl's Motion to Dismiss, Filing No. 66, and dismissed Plaintiff's claims against them with prejudice and terminated Haith and Kohl as parties to this action. Filing No. 153.

that follow, Dr. Hughes' and P.A. Schulz's and the State Defendants' motions for summary judgment are granted, and Goodwin's motions will be denied.

## I. BACKGROUND

Plaintiff Brandon A. Goodwin is an inmate currently incarcerated at the Tecumseh State Correctional Institution ("TSCI"), and he brings this action under 42 U.S.C. § 1983 against Dr. Hughes, P.A. Schulz, and the State Defendants for alleged deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments. The Court conducted an initial review of Plaintiff's Amended Complaint, Filing No. 21, on June 17, 2021, and allowed this matter to proceed to service of process against the Defendants in their individual capacities only.

In his Amended Complaint, Plaintiff alleges that in early 2015, while confined at the Nebraska State Penitentiary ("NSP"), he complained to medical staff of pain caused by hardware in his left ankle. *Id.* at 23–24, 27. Plaintiff eventually underwent surgery on March 15, 2016 at Southwest Lincoln Surgery Center during which Dr. Hughes and P.A. Schulz were "to remove all broken hardware (screws-pins-plate)" from Plaintiff's left ankle. *Id.* at 21. Plaintiff alleges that Dr. Hughes and P.A. Schulz left a broken piece of hardware in Plaintiff's ankle without informing Plaintiff or Nebraska Department of Correctional Services ("NDCS") medical staff of such. *Id.* at 21–22.

After surgery, Plaintiff alleges that he experienced pain from the remaining hardware in his left ankle. *Id.* at 22. He asserts that Dr. Hughes and P.A. Schulz prescribed pain medication and ordered Plaintiff to undergo physical therapy and to return in six to eight weeks for a follow-up. *Id.* at 22, 26, 38. Plaintiff alleges that the State Defendants did not follow or ignored these orders and interfered with prescribed

treatment, denied medications, denied treatment, denied Plaintiff's requests to consult with an outside specialist for removal of the retained hardware in his left ankle, and delayed medical treatment. *Id.* at 9–10. Plaintiff alleges that, since the surgery, he has "experienced chronic pain" and has been unable to participate in daily activities because of severe pain while walking. *Id.* at 34.

Dr. Hughes and P.A. Schulz filed a Motion for Summary Judgment on April 15, 2022. Filing No. 147. The State Defendants filed their Motion for Summary Judgment on April 18, 2022. Filing No. 150. With their motions, Defendants filed Briefs in Support, Filing No. 149; Filing No. 151, and Indexes of Evidence, Filing No. 148; Filing No. 152. On June 17, 2022, Plaintiff timely filed a Response to the State Defendants' summary judgment motion, Filing No. 165, and an Index of Evidence, Filing No. 166. Subsequently, on June 24, 2022, Plaintiff timely filed his Response to Dr. Hughes' and P.A. Schulz's motion, Filing No. 171. Also, on June 23, 2022, Plaintiff filed a Motion to Obtain Counsel, Filing No. 168, a Motion to Obtain Medical File, Filing No. 169, and a Motion to Obtain Expert Witness, Filing No. 170. Plaintiff then filed three more motions on June 27, 2022—a Motion for Funds of Service for Witness, Filing No. 172, a Motion to Subpoena David Samani as an expert witness, Filing No. 173, and a Motion to Subpoena his medical file, Filing No. 174. Dr. Hughes and P.A. Schulz filed a Reply Brief, Filing No. 175, and Supplemental Index, Filing No. 176, on July 1, 2022. The State Defendants did not file a reply brief.

On December 15, 2022, this matter was reassigned to the undersigned due to the retirement of the Honorable Richard G. Kopf. Plaintiff subsequently filed what the Court

docketed as a motion for miscellaneous relief on December 30, 2022. Filing No. 182. This matter is fully submitted for disposition.

## II. PRELIMINARY MATTERS

Before considering Defendants' Motions for Summary Judgment, Filing No. 147; Filing No. 150, the Court will first address Plaintiff's non-dispositive motions.

### A. Motion to Obtain Counsel, Filing No. 168

Plaintiff has renewed his request for the appointment of counsel because counsel is needed "to start to prepare for trial." Filing No. 168. The Court denied his previous requests for the appointment of counsel. Filing No. 16; Filing No. 28; Filing No. 60; Filing No. 127. In denying Plaintiff's previous requests for counsel, the Court carefully considered and weighed the factors set forth in *Recca v. Omaha Police Dep't*, 859 F. App'x 3 (8th Cir. 2021). Filing No. 28 at 16–18; Filing No. 60 at 1–2; Filing No. 127 at 5–6. Specifically, the Court stated that this is a relatively straightforward deliberate indifference to medical needs case and Plaintiff's pleadings, motions, and other filings demonstrated his ability to conduct discovery and to present his claims in written form. Filing No. 28 at 17–18; Filing No. 127 at 5–6. The circumstances have not changed significantly since his last request for appointment of counsel, and Plaintiff has not advanced any new arguments in support of his renewed request. Rather, Plaintiff seeks counsel only to prepare for trial in the event that Defendants' summary judgment motions are unsuccessful. In light of the Court's ruling on Defendants' Motions for Summary Judgment, and upon consideration of the *Recca* factors, Plaintiff's Motion to Obtain Counsel is denied for the reasons set forth in the Court's previous orders. *See id.*

**B. Motion and Subpoena for NDCS Medical File, Filing No. 169; Filing No. 174**

Plaintiff filed a motion to "obtain medical records from N.D.C.S. . . . to move forward for trial," Filing No. 169, and also asks the Court to issue a subpoena to NDCS to produce a copy of Plaintiff's medical file to him as Plaintiff is "aware that the Defendant already requested this and have [sic] in there possesion [sic]," Filing No. 174.

The deadline for serving requests for production expired on February 24, 2022, and the deadline for filing motions to compel was March 31, 2022, well before Plaintiff filed his motions in late June 2022. Filing No. 98; Filing No. 127 at 7, 9. The Court, thus, liberally construes Plaintiff's motions as seeking discovery pursuant to Federal Rule of Civil Procedure 56(d), which provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The party seeking the continuance for discovery must show: "(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 895 (8th Cir. 2014) (quoting *State of Cal., on Behalf of Cal. Dep't of Toxic Subs. Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)). "It is not enough to present a list of facts sought to be discovered. The nonmovant must articulate how those facts [a]re relevant to rebut the movant's showing of the absence of

a genuine issue of fact." *In re Mirapex Prod. Liab. Litig.*, 912 F.3d 1129, 1135 (8th Cir. 2019) (internal quotation marks and citation omitted). "A district court has wide discretion in ruling on a Rule 56(d) motion." *Jackson v. Riebold*, 815 F.3d 1114, 1121 (8th Cir. 2016) (internal quotation marks and citation omitted).

Upon careful consideration, Plaintiff's motions will be denied because Plaintiff has not made the required showing that the records he seeks are essential to resist Defendants' summary judgment motions. Indeed, Plaintiff has submitted a great number of medical records in his Index in opposition to the summary judgment motions, Filing No. 166, and has attached other relevant medical records to his Complaint, Filing No. 1, and Amended Complaint, Filing No. 21-1, which the Court will consider as discussed below. Without any explanation as to why Plaintiff's NDCS medical file is necessary to resist the pending summary judgment motions, and because Plaintiff, again, appears to seek the file only for purposes of trial, the motions are denied.

**C. Expert Witness Motions, Filing No. 170; Filing No. 172; Filing No. 173**

Plaintiff filed a motion seeking to obtain an expert witness "to prepare for trial." Filing No. 170. Plaintiff subsequently filed two more motions specifying that he wanted David Samani, M.D. ("Dr. Samani"), to testify on his behalf as an expert witness at trial and asked the Court to allow any witness fees that may be required and to subpoena Dr. Samani. Filing No. 172: Filing No. 173. Dr. Samani is a former defendant in this case, but the Court granted his motion for summary judgment on April 19, 2022, dismissing Plaintiff's claims against him with prejudice and terminating Dr. Samani as a party to this action. Filing No. 154.

To the extent Plaintiff seeks the issuance of a subpoena to have Dr. Samani testify at trial, Plaintiff's motion will be denied as moot in light of the Court's ruling below on Defendants' Motions for Summary Judgment. The Court will, however, consider Dr. Samani's declaration offered in support of his motion for summary judgment and re-offered by Dr. Hughes and P.A. Schulz in their Supplemental Index in ruling on the pending summary judgment motions. Filing No. 91-1; *see also* Filing No. 176.

**D. Motion for Relief, Filing No. 182**

On December 30, 2022, Plaintiff submitted correspondence which the Court docketed as a motion. Filing No. 182. Plaintiff indicates that a trial date should be set so that preparation can be done and expresses frustration with his inability to receive responses from Defendants to his requests to settle and resolve this matter. Lastly, Plaintiff asks the Court to order that he be seen by an "outside doctor for examination outside the lines of biasness that is not working [for NDCS] nor [has] any ties [to NDCS]." *Id*. at 2.

Given the Court's ruling below on Defendants' summary judgment motions, Plaintiff's requests will be denied as moot.

## III. SUMMARY JUDGMENT STANDARDS AND PROCEDURES

**A. Standard of Review**

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City*

*of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id*.

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id*. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id*. But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id*. "To show a genuine dispute of material fact, a party must provide more than conjecture and speculation. Rather the nonmovant has an affirmative burden to designate specific facts creating a triable controversy." *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019) (cleaned up). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791–92 (8th Cir. 2011) (cleaned up). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

**B. Summary Judgment Procedure**

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

This Court's local rules[2] further specify that "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). "The statement of facts should consist of short numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." NECivR 56.1(a)(2) (emphasis in original). "The statement must not contain legal conclusions." *Id.*

The opposing party's brief must include "a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). "Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to

[2] The Court has applied its local civil rules in effect at the time Defendants filed their Motions for Summary Judgment. NECivR 56.1 has been amended, effective December 1, 2022. Both versions of the Court's local rules can be accessed at: https://www.ned.uscourts.gov/attorney/local-rules.

affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed." *Id.*

A party's failure to comply with these requirements can have serious consequences: The moving party's "[f]ailure to submit a statement of facts" or "[f]ailure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion." NECivR 56.1(1)(a) (emphasis in original). On the other hand,"[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(1)(b)(1) (emphasis in original).

**C. Evidence Presented**

In this case, Dr. Hughes' and P.A. Schulz's and the State Defendants' Briefs in support of their respective motions for summary judgment contain a separate statement of material facts in accordance with the Court's local rules with references to the record and properly authenticated evidence. Filing No. 149 at 2–7; Filing No. 151 at 2–8.

Plaintiff did not directly respond to any of Defendants' numbered statements of fact. Accordingly, those facts are considered admitted unless otherwise contained in the parties' verified factual submissions. *See* NECivR 56.1(1)(b)(1); Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."). Although Plaintiff is proceeding pro se, he is bound by and must comply with all local and federal procedural rules.[3] NEGenR 1.3(g).

[3] Indeed, Plaintiff was previously informed of his obligation to comply with local and federal procedural rules and the consequences of failing to respond to a defendant's statement of material facts in the April 19, 2022

To the extent admissible, the Court has considered Plaintiff's Index of Evidence, Filing No. 166, Amended Complaint, Filing No. 21; Filing No. 21-1, and Plaintiff's verified initial Complaint, Filing No. 1. *See Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994 (8th Cir. 2001) ("A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment . . . ." (cleaned up)). However, the Court has not considered Plaintiff's legal conclusions and arguments asserted as facts because such statements are not admissible to oppose summary judgment.

## IV. RELEVANT UNDISPUTED MATERIAL FACTS

Based on the discussion above, the following are the statements of undisputed material facts that are supported by admissible evidence and pinpoint citations to the record, and have either been admitted directly or by rule:

1. Goodwin is currently an inmate in the custody of the NDCS, serving a term of incarceration at TSCI.[4] Filing No. 148-4 at 5, Deposition of Goodwin ("Goodwin Depo.") 9:3–8.[5]

2. Goodwin has been at TSCI since November 2017. *Id*. Goodwin was previously at the NSP prior to his transfer to TSCI. *Id*. at 9, Goodwin Depo. 27:14–21.

---

Memorandum and Order granting summary judgment for Dr. Samani. Filing No. 154 at 4–6. Plaintiff was also provided a copy of the Court's local rules at his request on September 7, 2021. Filing No. 49.

[4] Goodwin indicated in his motion for status filed on July 5, 2023, that he expected "to transfer relatively soon." Filing No. 186 at 1. The NDCS' online records indicate Goodwin is now housed at the Reception and Treatment Center in Lincoln, Nebraska. *See* https://dcs-inmatesearch.ne.gov/Corrections/InmateDisplayServlet?DcsId=83325&return=true (last visited Sept. 28, 2023), *archived at* https://perma.cc/Y27A-PGJE.

[5] Both Dr. Hughes and P.A. Schulz and the State Defendants submitted a copy of Goodwin's deposition along with authenticating affidavits in support of their respective summary judgment motions. Filing No. 148-4; Filing No. 152-5. For ease of reference, the Court will cite to Goodwin's deposition contained in Dr. Hughes' and P.A. Schulz's Index, Filing No. 148-4.

3. Goodwin was in NDCS custody in some or all of 2015, 2016 and 2017. *Id*. at 6–7, 14, Goodwin Depo. 16:23–17:10; 45:12–46:3.

4. Prior to his current prison stint, Goodwin broke his ankle in 2013. *Id*. at 12, Goodwin Depo. 38:20–39:6. He received surgery at the time on his ankle that included a medical contraption, pins, and bars going through the bones of his ankle. *Id*. at 12–13, Goodwin Depo. 40:21–41:2.

**Dr. Hughes and P.A. Schulz**

5. Goodwin later had another surgery with Dr. Hughes and P.A. Schulz in 2016, while at the Diagnostic and Evaluation Center ("D&E") in Lincoln, Nebraska. *Id*. at 9, Goodwin Depo. 27:17–28:4. Dr. Hughes is a "surgeon and private physician" who, at all relevant times to these proceedings, was engaged in a private medical practice in Lincoln, Nebraska. Filing No. 21 at 20; Filing No. 148-1 at 2, Declaration of Dr. Hughes ("Hughes Decl."), ¶ 8. P.A. Schulz was a physician's assistant who assisted Dr. Hughes in his treatment of Goodwin. Filing No. 148-2 at 1, Declaration of P.A. Schulz ("Schulz Decl."), ¶ 4.

6. On February 26, 2016, approximately two weeks prior to surgery, Dr. Hughes saw Goodwin in his office after a referral from the NDCS. Filing No. 148-1 at 2–3, Hughes Decl., ¶¶ 10, 12(a). Goodwin had previously had an open reduction with internal fixation of his fractured left ankle. *Id*. at 3, Hughes Decl., ¶ 12(a). Some of the installed hardware was backing out and becoming painful. *Id*. Based on radiological imaging, Dr. Hughes was able to see that one of the syndesmotic screws in Goodwin's left tibia had broken. *Id*. Dr. Hughes advised Goodwin he would be able to remove the intact hardware so long as the screws did not break while he was removing them. *Id*. Dr.

Hughes also advised Goodwin he would not be able to remove the large piece of the broken syndesmotic screw embedded in Goodwin's tibia. *Id*. Goodwin elected to move forward with the procedure. *Id*.

7. On March 15, 2016, Dr. Hughes, along with P.A. Schulz, "performed a [sic] operation on Plaintiff at South-West Lincoln Surgery Center" to "remove hardware (screws-pins-plate)" from his left ankle. Filing No. 21 at 21; Filing No. 148-1 at 3, Hughes Decl., ¶ 12(b).

8. Approximately two weeks after the surgery, Dr. Hughes saw Goodwin for a postsurgical follow up visit. The visit occurred at Dr. Hughes' clinic office in Lincoln. Filing No. 148-1 at 3, Hughes Decl., ¶ 12(c).

9. At that time, Dr. Hughes physically examined Goodwin. Goodwin's left leg and ankle had no deformity and normal arches. The incisions were well healed and non-tender. Dr. Hughes removed the remaining staples and there was no sign of infection. Dr. Hughes advised Goodwin he could engage in any activities Goodwin could tolerate and to follow up if necessary. *Id*.

10. Dr. Hughes next saw Goodwin in May 2017, again in his Lincoln office. Id. at 3–4, Hughes Decl., ¶ 12(d). Goodwin complained of pain and attributed it to the broken screw in his tibia. *Id*.

11. After examining Goodwin, Dr. Hughes and P.A. Schulz told Goodwin that in their opinion, the retained hardware was not the cause or source of Goodwin's pain. *Id*. at 4, Hughes Decl., ¶ 12(d); Filing No. 148-2 at 3, Schulz Decl., ¶ 8(d). They believed Goodwin was experiencing neuropathy of an unknown etiology. *Id*.

12. Goodwin agrees the opinions Dr. Hughes and P.A. Schulz expressed in May 2017 were their genuinely held professional opinions. Filing No. 148-4 at 19–20, Goodwin Depo. 68:5–70:1.

13. Although they did not believe the screw to be the source of Goodwin's pain, Dr. Hughes and P.A. Schulz attempted to address Goodwin's pain complaints by prescribing physical therapy and two medications—gabapentin and Lyrica for neuropathy. Filing No. 21 at 26; Filing No. 148-1 at 4, Hughes Decl., ¶ 12(d). They also recommended Goodwin return in 6 to 8 weeks. Filing No. 148-1 at 4, Hughes Decl., ¶ 12(d). At that point, if Goodwin continued to have pain, the next step would likely be to request an MRI so they could evaluate his left Anterior Talo-Fibular Ligament (ATFL) and his left talar dome. *Id*.

14. Dr. Hughes' office transmitted the orders to the Department of Corrections. *Id*.; Filing No. 1 at 22. Although Dr. Hughes and his medical staff made certain recommendations to the NDCS medical staff, they had no power or authority to compel NDCS to follow their recommendations. Filing No. 148-1 at 4, Hughes Decl., ¶ 13; Filing No. 148-2 at 4, Schulz Decl., ¶ 9.

15. Goodwin did not return as recommended, alleging prison staff denied him the opportunity to do so. Filing No. 21 at 30; Filing No. 148-1 at 4, Hughes Decl., ¶ 12(e). Goodwin also alleges NDCS medical staff did not follow, or ignored, Dr. Hughes' and P.A. Schulz's orders, interfered with the prescribed treatment, denied medications and treatment, and denied his request to see another outside specialist related to removal of the remaining hardware. Filing No. 21 at 30.

16. At no time did NDCS officials contact Dr. Hughes or P.A. Schulz to discuss Dr. Hughes' and P.A. Schulz's recommendations, and at no time did Dr. Hughes or P.A. Schulz participate in any decisions by prison officials as to whether their recommendations would be followed by NDCS officials. Filing No. 148-1 at 4–5, Hughes Decl., ¶ 13; Filing No. 148-2 at 4, Schulz Decl., ¶ 9.

17. At no time were the medical and professional decisions of Dr. Hughes and P.A. Schulz, with respect to their care and treatment of Goodwin, directed by or influenced by any NDCS employees or officials. Filing No. 148-1 at 5, Hughes Decl., ¶ 14; Filing No. 148-2 at 4, Schulz Decl., ¶ 10. At all times Dr. Hughes and P.A. Schulz exercised their own independent medical and professional judgment. *Id*.

18. Based on his medical education, training, and experience, and to a reasonable degree of medical certainty, and based upon his knowledge of Goodwin's medical condition, it was Dr. Hughes' opinion that at all times while he and his staff provided medical services to Goodwin that:

a. it was not medically necessary to remove the broken syndesmotic screw in Goodwin's left tibia;

b. the embedded screw did not pose a serious medical risk to Goodwin at any time;

c. the embedded screw was not the cause of Goodwin's pain in May 2017;

d. the symptoms Goodwin described, and the location of the pain Goodwin identified, were not consistent with the retained screw being the source of his pain; and

e. the retained screw was surrounded completely by bone and therefore was not likely to have been symptomatic.

Filing No. 148-1 at 5, Hughes Decl., ¶ 15.

19. Based upon his education, training and experience, Dr. Hughes is personally familiar with the standard of care, skill, and knowledge applicable to orthopedic surgeons providing care and treatment to patients in Lincoln, Nebraska, and similar communities. *Id*., Hughes Decl., ¶ 16. For the same reasons, Dr. Hughes is also familiar with the standard of care, skill, and knowledge applicable to orthopedic physicians' assistants providing care and treatment to patients in Lincoln, Nebraska, and similar communities. *Id*. at 6, Hughes Decl., ¶ 17.

20. By virtue of her experience as an orthopedic physician's assistant in Lincoln, Nebraska, P.A. Schulz is also familiar with the standard of care, skill, and knowledge applicable to orthopedic physicians' assistants providing care and treatment to patients in Lincoln, Nebraska, and similar communities. Filing No. 148-2 at 5, Schulz Decl., ¶ 12.

21. Based on Dr. Hughes' medical education, training and experience, and his review of the pertinent records, it is his opinion to a reasonable degree of medical/surgical certainty that he, P.A. Schulz, and Dr. Hughes' medical staff at all times exercised the degree of care, skill, and knowledge ordinarily possessed and used under like circumstances by orthopedic surgeons and the medical midlevel professionals and their orthopedic staff in providing care and treatment to patients in Lincoln, Nebraska, or similar communities at all times, including specifically Goodwin. Filing No. 148-1 at 6, Hughes Decl., ¶ 18. Based on the foregoing, in Dr. Hughes' opinion, neither he, P.A. Schulz, nor their staff breached the standard of care in any respect with regard to the medical services

they provided to Goodwin. *Id*. Nor are Dr. Hughes, P.A. Schulz, or their staff the proximate cause of any damages Goodwin alleges in the above-captioned case. *Id*.

22. Another orthopedic surgeon, Dr. Thomas Connolly, agrees. Dr. Connolly is board certified in Sports Medicine and General Orthopedic Surgery by the American Board of Orthopedic Surgery. Filing No. 148-3 at 2, Declaration of Thomas Connolly, M.D. ("Connolly Decl."), ¶ 5. Based upon his education, training and experience, Dr. Connolly is also personally familiar with the standard of care, skill, and knowledge applicable to orthopedic surgeons providing care and treatment to patients in Lincoln, Nebraska, and similar communities. *Id*. at 4, Connolly Decl., ¶ 11. Dr. Connolly has reviewed Goodwin's medical records and all available radiological images. *Id*. at 2, Connolly Decl., ¶¶ 6–7. Based on his education, training and experience, Dr. Connolly has concluded, to a reasonable degree of medical certainty, that Dr. Hughes, P.A. Schulz, and their staff at all times met the standard of care. *Id*. at 4–5, Connolly Decl. ¶ 12. Based on the foregoing, including his review of Goodwin's medical records, Dr. Connolly has also determined the broken screw is not the likely cause of Goodwin's alleged pain, and removing the embedded screw will not alleviate Goodwin's pain. *Id*. at 4, Connolly Decl., ¶ 10(d). Finally, it is Dr. Connolly's opinion that Dr. Hughes, P.A. Schulz, and their staff are not a proximate cause of any of the damages or injuries Goodwin claims in this case. *Id*. at 4–5, Connolly Decl., ¶ 12.

**<u>State Defendants</u>**

23. Following his 2017 consultation with Dr. Hughes, Goodwin claims that he was supposed to have been prescribed physical therapy and pain medication from the

State Defendants working through NDCS, which he asserts never happened. Filing No. 148-4 at 9, Goodwin Depo. 26:15–25.

24. Dr. Kasselman is a Physician at TSCI in Tecumseh, Nebraska. Filing No. 152-1 at 2, Affidavit of Dr. Kasselman ("Kasselman Aff."), ¶ 1.

25. Dr. Kasselman has been at TSCI since March 1, 2017. *Id*., Kasselman Aff., ¶ 2.

26. Dr. Kasselman received his medical degree from the University of Kansas in 1995. *Id*., Kasselman Aff., ¶ 3.

27. Dr. Kasselman is currently licensed to practice medicine in the State of Nebraska. *Id*., Kasselman Aff., ¶ 4.

28. Dr. Kasselman has completed a fellowship in Intervention Pain Management through the University of Nebraska Department of Anesthesiology/Neurosurgery. *Id*. at 3, Kasselman Aff., ¶ 15.

29. Dr. Kasselman is currently board certified in the area of Family Practice. *Id*. at 2, Kasselman Aff., ¶ 5.

30. Dr. Kasselman's current job duties and responsibilities are Clinic, SNF, and RHU.[6] *Id*., Kasselman Aff., ¶ 6.

31. Dr. Kasselman's medical appointments with Goodwin were due to Goodwin's chronic pain in his back, shoulder, and face. *Id*., Kasselman Aff., ¶ 9.

32. In each of these medical appointments, Dr. Kasselman treated Goodwin to the best of his abilities based on his medical training and experience. *Id*., Kasselman Aff., ¶ 10.

---

[6] The Court understands "SNF" to mean Skilled Nursing Facility and "RHU" to mean Restrictive Housing Unit.

33. Dr. Kasselman's medical recommendations and treatment for Goodwin were for management of the above conditions and prevention of further progression as well as to maintain ability to perform activities of daily living. *Id*., Kasselman Aff., ¶ 11.

34. The discontinuation of Goodwin's medication by Dr. Kasselman, including gabapentin, were made due to Goodwin's use and abuse of drugs within TSCI. *Id*., Kasselman Aff., ¶ 12.

35. Dr. Kasselman's discontinuation complied with policies set forth by the Nebraska Department of Correctional Services and is consistent with the discontinuation of medication to inmates based on similar violations and is routinely followed by the clinic. *Id*., Kasselman Aff., ¶ 13.

36. Goodwin's medication was discontinued by Dr. Kasselman either for behavioral issues, as this medication can alter behavior, because of possession of other substances, or for passing and receiving. *Id*. at 3, Kasselman Aff., ¶ 14.

37. Dr. Kasselman wrote in Goodwin's medical records on December 5, 2019, "Compliance with all medical request is required for this medication. Your lab refusal violated our agreement as well as compliance [with] medical. This was your last chance & there will be no renewals." Filing No. 21-1 at 82.

38. Dr. Kasselman cancelled Goodwin's physical therapy because Goodwin requested it. *Id*. at 69, 71.

39. Dr. Damme is a physician at TSCI in Tecumseh, Nebraska. Filing No. 152-2 at 2, Affidavit of Dr. Damme ("Damme Aff."), ¶ 1.[7]

[7] The paragraph numbers represent the corresponding bullet points in Dr. Damme's affidavit. *See* Filing No. 152-2.

40. Dr. Damme has been at TSCI between August 5, 2011 to October 21, 2016 employed by Correct Care Solutions, then between July 9, 2018 to February 8, 2019 as an independent contractor, and has been employed by the Nebraska Department of Corrections from February 11, 2019 to present. *Id*., Damme Aff., ¶ 2.

41. Dr. Damme received his medical degree from the University of Nebraska Medical Center in May 2002. *Id*., Damme Aff., ¶ 3.

42. Dr. Damme is currently licensed to practice medicine in the State of Nebraska. *Id*., Damme Aff., ¶ 4.

43. Dr. Damme's specialty is in the field of Family Medicine. *Id*., Damme Aff., ¶ 5.

44. Dr. Damme's current job duties and responsibilities are providing general health care to the male population of TSCI. *Id*., Damme Aff., ¶ 6.

45. Dr. Damme first met Goodwin on March 28, 2019. *Id*., Damme Aff., ¶ 7.

46. Dr. Damme has met with Goodwin approximately eight times since that date in clinic. *Id*., Damme Aff., ¶ 8.

47. Dr. Damme's medical appointments with Goodwin were due to multiple reasons. *Id*., Damme Aff., ¶ 9.

48. Dr. Damme treated Goodwin to the best of his abilities based on his medical training and experience. *Id*., Damme Aff., ¶ 10.

49. Dr. Damme discontinued Goodwin's medications, including narcotics and gabapentin, due to Goodwin's use and abuse of drugs within TSCI. *Id*., Damme Aff., ¶ 11.

50. Dr. Damme made the decision to terminate the use of the pain medication Salsalate in May 2019 based on Goodwin refusing to take the medication. Filing No. 21-1 at 69.

51. Dr. Damme allowed Goodwin to continue to use ibuprofen, as well as the prescription medication gabapentin, through November 2019. *Id*. at 80.

52. Dr. Damme's discontinuation of Goodwin's medications complies with the policies set forth by the Nebraska Department of Correctional Services and is consistent with the discontinuation of medication to inmates based on similar violations. Filing No. 152-2 at 2, Damme Aff., ¶ 13.

53. Dr. Damme concluded that there was no internal damage remaining in Goodwin's ankle, writing on January 21, 2020, "Your recent left foot and ankle x-ray showed no acute boney abnormalities and a well healed ankle fracture. You do have part of a screw remaining within the distal tibia that is within the bone and causing no soft tissue issues." Filing No. 21-1 at 88.

54. Dr. Che was previously a physician at the NSP in Lincoln, Nebraska. Filing No. 152-4 at 1, Affidavit of Dr. Che ("Che Aff."), ¶ 1.

55. Dr. Che worked at the NSP between September 2016 and June 2017. *Id*. at 2, Che Aff., ¶ 2.

56. Dr. Che received his education from the University of Texas Medical Branch in Galveston, Texas in 2014. *Id*., Che Aff., ¶ 3.

57. Dr. Che's job responsibilities at Nebraska State Penitentiary were as a primary care physician. *Id*., Che Aff., ¶ 4.[8]

---

[8] The paragraphs in Dr. Che's affidavit are misnumbered. *See* Filing No. 152-4. The paragraph numbers used by the Court correspond to the sequential order of the paragraphs in the affidavit.

58. Dr. Che first met Goodwin in September 2016. *Id*., Che Aff., ¶ 5.

59. Dr. Che treated Goodwin approximately five times. *Id*., Che Aff., ¶ 6.

60. Dr. Che's medical recommendations and treatment for Goodwin included referring him to orthopedic surgery, helping manage his chronic pain, and other medical/psychological ailments. *Id*., Che Aff., ¶ 9.

61. Dr. Che cut off Goodwin's pain medication due to Goodwin's past history of abuse with other recreational substances. Filing No. 21-1 at 40.

## IV. DISCUSSION

### A. Eighth Amendment Deliberate Indifference Claims

Goodwin claims Dr. Hughes, P.A. Schulz, and the State Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments. To prevail on an Eighth Amendment claim, Goodwin must prove that Defendants acted with deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). *see also Laganiere v. Cty. of Olmsted*, 772 F.3d 1114, 1116 (8th Cir. 2014) ("The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from deliberate indifference to serious medical needs."). The deliberate-indifference standard includes both an objective and a subjective component. Goodwin must demonstrate that (1) he suffered from objectively serious medical needs, and (2) Defendants knew of, but deliberately disregarded, those needs. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even

a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotation and citation omitted).

"For a claim of deliberate indifference, 'the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)); *see also Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (a prisoner's mere disagreement with the course of his medical treatment fails to state a claim against a prison physician for deliberate indifference under the Eighth Amendment). Indeed, "[e]stablishing the subjective component of a deliberate indifference claim requires showing 'a mental state akin to criminal recklessness.'" *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017) (quoting *Thompson v. King*, 730 F.3d 742, 746–47 (8th Cir. 2013)).

"The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007). The Eighth Circuit has held that prison medical professionals do not act with deliberate indifference where they do not ignore a prisoner's complaints but exercise independent medical judgment and attempt to treat them in a manner other than the precise manner the prisoner requests. *See Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (granting summary judgment to medical defendants who did not ignore inmate's complaints but saw inmate on several occasions and tried numerous treatments); *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors were not deliberately

indifferent where they treated prisoner on numerous occasions and offered sensible medication and treatment).

A prison doctor also does not act with deliberate indifference when, in an exercise of his professional judgment, he concludes that an inmate will not be placed at risk by foregoing a particular course of treatment, including surgery. *See, e.g., Jenkins v. Cty. of Hennepin*, 557 F.3d 628, 632 (8th Cir. 2009) (holding defendant who decided to postpone x-ray based on medical judgment that injury was not urgent entitled to summary judgment); *Blondheim v. County of Olmsted*, 47 Fed. App'x 786 (8th Cir. 2002) (unpublished) (doctors at correctional facility were not deliberately indifferent by treating inmate's torn ACL conservatively over 4 years, mainly with Tylenol and ace bandages, even though they knew outside orthopedic surgeon had recommended surgery). Differences of opinion, mistakes, and even medical malpractice do not meet the exacting standard of deliberate indifference. *See Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002) ("At best, [the plaintiff's] allegations state a difference in opinion between himself and his doctors or allege a mistake in classification or treatment. Neither differences of opinion nor medical malpractice state an actionable Constitutional violation.").

With these standards in mind, the Court now reviews Plaintiff's claims against Defendants and concludes the undisputed material facts establish that Defendants are entitled to judgment as a matter of law.

**B. Dr. Hughes and P.A. Schulz**

***1. No Action Under Color of State Law***

Plaintiff's federal constitutional claims against Dr. Hughes and P.A. Schulze are brought pursuant to 42 U.S.C. § 1983, which requires a showing that the alleged

deprivation of rights was caused by conduct of a person acting "under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id*. at 49. Stated another way, "[a]nyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). In determining whether a defendant's conduct is fairly attributable to the state, the Eighth Circuit has explained:

> To begin with, there can be no "fair attribution" unless the alleged constitutional violation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." Furthermore, "the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."

*Montano v. Hedgepeth*, 120 F.3d 844, 848 (8th Cir. 1997) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)) (internal citations omitted). *See also Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (private party may be characterized as state actor for purposes of § 1983 when "the state has delegated to a private party a power traditionally exclusively reserved to the State," "where a private actor is a willful participant in joint activity with the State or its agents," and "where there is pervasive entwinement between the private entity and the state," with the ultimate conclusion turning on the particular facts of the case (internal quotation marks and citations omitted)).

Dr. Hughes and P.A. Schulz argue that they were not acting under color of state law by performing Goodwin's hardware removal surgery and seeing him for two follow-up visits. They cite to several cases where courts concluded that a private physician with no

contractual relationship with the state treating an inmate at a private facility, and exercising his or her own medical judgment, does not act under color of state law. *See, e.g.*, *Bevins v. Becker Cnty., Minnesota*, No. CV 16-4340 (NEB/BRT), 2018 WL 7247176, *9–10 (D. Minn. Oct. 30, 2018), *report and recommendation adopted*, No. 16-CV-4340 (NEB/BRT), 2019 WL 397322 (D. Minn. Jan. 31, 2019) (hospital defendants who had not contracted with state to provide medical care were not acting under color of state law when they treated inmate twice for abdominal pain where no proof of ongoing relationship between hospital and jail, inmate was taken to hospital on an as-needed basis, and hospital defendants treated inmate in private facility while exercising their own independent medical judgment); *Griffis v. Medford*, No. CIV. 05-3040, 2007 WL 2752373, *6 (W.D. Ark. Sept. 20, 2007) (finding that "a private physician treating an inmate at a private facility utilizing his independent medical judgment . . . does not act under color of state law for purposes of § 1983"); *Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (private orthopedic surgeon who was not under contract with Bureau of Prisons and performed elbow surgery on inmate at private facility was not acting under color of state law). In his brief in opposition, Plaintiff argues Dr. Hughes and P.A. Schulz acted under color of law under the holding of *Conner v. Donnelly*, 42 F.3d 220 (4th Cir. 1994), in which the Fourth Circuit Court of Appeals concluded that private physicians who treat state prisoners without a contract are state actors because of their function of providing medical care on behalf of the state and with the state's authorization.

The Court finds the Fourth Circuit's holding in *Connor* conflicts with "the Eighth Circuit's application of the functional view of state action in *Montano*, 120 F.3d at 850." *Griffis*, No. CIV. 05-3040, 2007 WL 2752373, at *6. Under that functional approach, the

Court concludes there is too little connection between the state and Dr. Hughes and P.A. Schulz to consider their conduct fairly attributable to the state. The undisputed material facts establish that at no time were Dr. Hughes or P.A. Schulz employees of the state or under a contract with any governmental entity to provide medical care to inmates. Filing No. 148-1 at 2, Hughes Decl., ¶ 9; Filing No. 148-2 at 2, Schulz Decl., ¶ 5. As Goodwin has admitted, Dr. Hughes and P.A. Schulz were "outside" "private" medical providers. Filing No. 1 at 21–23; Filing No. 21 at 20. *See Hardy v. Corr. Med. Servs.*, No. 4:12CV1 HEA, 2012 WL 5258954, at *2 (E.D. Mo. Oct. 23, 2012) (citing prisoner plaintiff's admission that surgeon was an "outside" doctor as a factor in finding doctor was not a state actor). Dr. Hughes and P.A. Schulz exercised their own independent judgment when they performed surgery on Goodwin at a private surgical center and when they saw Goodwin for two follow-up appointments at their private medical office. There is no evidence that Dr. Hughes and P.A. Schulz acted at the direction of NDCS officials or that there was any kind of on-going relationship between the private physicians and NDCS. Rather, the undisputed facts show that NDCS referred Goodwin to Dr. Hughes and P.A. Schulz on an as-needed basis, and Dr. Hughes and P.A. Schulz assisted NDCS in treating Goodwin, as opposed to assuming responsibility for his medical care. *See id.* ("When determining whether a private physician may be held liable under § 1983 as a state actor, courts should consider the 'degree to which the work of the private medical provider is controlled or influenced by the state,' the nature of 'the contractual relationship between the state and the medical care provider,' and the degree to which the private entity replaces the State's provision of medical care to prisoners, as opposed to simply

assisting the State.” (quoting *Rodriguez v. Plymouth Ambulance Svc.*, 577 F.3d 816, 825–29 (7th Cir.2009))).

***2. No Eighth Amendment Violation***

Even if the Court assumes that Dr. Hughes and P.A. Schulz were state actors for purposes of § 1983, the undisputed evidence establishes that they provided Goodwin with appropriate medical care and were not deliberately indifferent to any of Goodwin’s serious medical needs. Dr. Hughes and P.A. Schulz saw Goodwin on four occasions, the first of which occurred on February 26, 2016, prior to the hardware removal surgery. At that time, Dr. Hughes advised Goodwin that he would be unable to remove the broken screw embedded in Goodwin’s tibia. Filing No. 148-1 at 3, Hughes Decl., ¶ 12(a); *see also Id*. at 23. Knowing this, Goodwin opted to proceed with the surgery, which took place on March 15, 2016. During the surgery, Dr. Hughes, with P.A. Schulz’s assistance, removed the intact hardware from Goodwin’s left ankle to address his complaints of pain. *Id*. at 3, Hughes Decl., ¶ 12(b). Dr. Hughes and P.A. Schulz then saw Goodwin two weeks later for his post-operative check where they noted the surgical incisions were healing and there were no signs of infection. Goodwin was then released from further care with no restrictions. *Id*., Hughes Decl., ¶ 12(c).

Finally, Dr. Hughes and P.A. Schulz saw Goodwin on May 18, 2017, for follow-up complaints of pain in his ankle. Based on their examination, Dr. Hughes and P.A. Schulz concluded the retained hardware was not the source of Goodwin’s pain as it was surrounded completely by bone and Goodwin was likely suffering from peripheral neuropathy of an unknown etiology. *Id*. at 4, Hughes Decl., ¶ 12(d). However, Dr. Hughes and P.A. Schulz attempted to address Goodwin’s pain by prescribing physical therapy

and medications. *Id*. They also recommended that Goodwin return in six to eight weeks and that if he was still experiencing pain, then the next likely step would be an MRI. *Id*. These orders and recommendations were transmitted to NDCS, Filing No. 1 at 22, but Goodwin did not return as recommended, alleging prison staff denied him the opportunity to do so, Filing No. 21 at 30; Filing No. 148-1 at 4, Hughes Decl., ¶ 12(e). In both Dr. Hughes' and P.A. Schulz's opinions, they "exercised the degree of care, skill and knowledge ordinarily possessed and used under like circumstances by orthopedic surgeons and orthopedic physicians' assistants in providing care and treatment to patients in Lincoln, Nebraska, or similar communities at all times and to Mr. Goodwin," they did not breach the standard of care in any respect with regard to the medical services they provided to Goodwin, and they were not "the proximate cause of any damage Mr. Goodwin alleges" in this lawsuit. Filing No. 148-1 at 6, Hughes Decl., ¶ 18; Filing No. 148-2 at 5, Schulz Decl., ¶ 13.

Based on this undisputed evidence, Goodwin cannot demonstrate that Dr. Hughes and P.A. Schulz were deliberately indifferent to any of his serious medical needs. Goodwin argues, however, that the surgery was supposed to remove *all* the hardware in his ankle and, because other medical professionals have said that the remaining hardware can be removed, Dr. Hughes and P.A. Schulz failure to remove the embedded screw initially constitutes deliberate indifference. Filing No. 171 at 3, 5, 7. Goodwin also asserts that Dr. Hughes and P.A. Schulz have "down played" his complaints of pain, and he disputes their opinions that the remaining screw is not the source of his pain as "there is nothing that suggests it is not either." Filing No. 171 at 4–5.

Goodwin does not cite to any evidence in his brief to support his assertion that Dr. Hughes' and P.A. Schulz's failure to remove the embedded screw in his March 2016 surgery constitutes deliberate indifference. *See* Filing No. 171. In his Index of Evidence in response to the State Defendants' summary judgment motion, Goodwin did provide documentation of a November 2020 follow up evaluation in which Dr. Samani recommended "[p]ossible removal of syndesmotic screw." Filing No. 166 at 23. But even this evidence does not create a genuine dispute of material fact that Dr. Hughes and P.A. Schulz were deliberately indifferent to Goodwin's serious medical needs by leaving the broken syndesmotic screw in place. First, Goodwin was informed prior to his surgery that Dr. Hughes would not remove the broken screw embedded in Goodwin's tibia. Filing No. 148-1 at 23. Second, even though he recommended possible removal of the remaining syndesmotic screw, Dr. Samani opined "that the presence of the screw did not pose a serious medical risk to Plaintiff and that a procedure to remove the screw was not medically necessary within any defined time frame." Filing No. 91-1 at 5; *see also* Filing No. 176. Thus, the Court finds Goodwin's unsupported assertions are insufficient to rebut Dr. Hughes' properly supported expert opinions that removal of the broken syndesmotic screw from Goodwin's left ankle was not medically necessary and did not pose a serious risk of harm or disability to Goodwin at any time. Filing No. 148-1 at 5, Hughes Decl., ¶ 15. *See* *Reid v. Griffin*, 808 F.3d 1191, 1193 (8th Cir. 2015) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment" (cleaned up)); *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (same).

Similarly, Goodwin's conclusory assertions that the broken remaining hardware in his ankle is the source of his pain do not create a genuine issue of material fact preventing summary judgment. Dr. Hughes and P.A. Schulz have offered their expert opinions that the remaining hardware is not the source of Goodwin's pain and does not present a risk of harm to Goodwin. Filing No. 148-1 at 4–5, Hughes Decl., ¶¶ 12(d), 15; Filing No. 148-2 at 3–4, Schulz Decl., ¶ 8(d). Another orthopedic surgeon, Dr. Thomas Connolly, also reviewed Goodwin's medical records and opined that the embedded screw is not the cause of Goodwin's discomfort and that its presence does not constitute a serious medical need. Filing No. 148-3 at 3–4, Connolly Decl., ¶ 10. Goodwin's unverified, lay assertions to the contrary are insufficient to rebut these expert opinions. Rather, Goodwin's allegations merely demonstrate his "difference of opinion over matters of expert medical judgment or a course of medical treatment [which] fail[s] to rise to the level of a constitutional violation." *Meuir*, 487 F.3d at 1118–19 (second alteration in original and quoting *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992)).

Finally, to the extent Goodwin's Amended Complaint alleges Dr. Hughes and P.A. Schulz were deliberately indifferent to his serious medical needs because Goodwin was allegedly prevented from receiving his prescribed medication, receiving physical therapy, or being seen for further follow-up appointments, such claims fail as a matter of law because the undisputed evidence establishes that Dr. Hughes and P.A. Schulz lacked authority to provide Plaintiff with such additional treatment. As Dr. Hughes attests, neither he nor P.A. Schulz had any control, or right of control, as to whether prison officials followed their orders or recommendations once Goodwin returned to the facility. Filing No. 148-1 at 4, Hughes Decl., ¶ 13. All Dr. Hughes and P.A. Schulz could do was make

their recommendations. *Id*. It was then up to NDCS personnel to implement or follow through on those recommendations. As the Eighth Circuit has recognized, a medical professional cannot be found to have acted with deliberate indifference by not providing treatment he or she did not have the authority to provide. *See Bender*, 385 F.3d at 1137–38 (doctor could not be held liable for deliberate indifference when he believed that he lacked authority to order treatment plaintiff claimed he should have received); *see also Reid v. Sapp*, 84 Fed. App'x 550, 552 (6th Cir. 2003) (determining a doctor could not be liable for deliberate indifference because he lacked the authority to approve or deny surgery).

**C. State Defendants**

The State Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id*. "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

Accordingly, in reviewing the State Defendants' motion, the Court will first examine whether the facts as alleged by Goodwin reasonably show that the individually-named State Defendants have violated his constitutional rights. If the facts do not show a violation, the Court need not proceed further with the qualified immunity analysis.

***1. Delay in Treatment***

Generally, Goodwin claims that Dr. Kasselman, Dr. Damme, and Dr. Che were deliberately indifferent to his serious medical needs because they all failed to follow, or intentionally interfered with, treatment that was previously prescribed, particularly the treatment orders of Dr. Hughes' and P.A. Schulz, discontinued Goodwin's pain medication, and failed to treat his chronic pain. Filing No. 21 at 9–11, 25–26, 28, 33–43. Plaintiff asserts that he has experienced "chronic pain" since his 2016 surgery and the State Defendants' actions of denying physical therapy, medications, and follow-up appointments, and their "excessive delay [in treating Goodwin] could possibly mean permanent damage and disability." Filing No. 165 at 2–3.

The constitutional obligation to provide medical care to those in custody may be violated when officials "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfer[e] with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05; *see also Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) ("A delay in treating a serious medical need can constitute deliberate indifference."). When a deliberate-indifference claim is based on such a delay, the Court measures "the objective seriousness of the deprivation . . . by reference to the effect of delay in treatment. To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Jackson v. Riebold*, 815 F.3d 1114, 1119–20 (8th Cir. 2016) (internal quotation marks and citations omitted). Specifically, the prisoner "must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotation marks and citations omitted).

Here, Goodwin has not met his burden as he has produced no evidence creating a genuine issue of material fact that the State Defendants' alleged delay in following Dr. Hughes' orders and treating his chronic ankle pain adversely affected his prognosis or resulted in permanent damage or injury. As discussed above, the undisputed evidence establishes that the remaining screw in Goodwin's tibia does not constitute a serious risk to Goodwin. None of Goodwin's treating physicians associate any permanency issues with the retained hardware in his ankle. Filing No. 148-4 at 19, Goodwin Depo. 66:7–67:3. Nor do his treating physicians attribute Goodwin's pain complaints to the retained screw. *Id*., Goodwin Depo. 66:24–68:4. Even if the retained screw contributes to

Goodwin's discomfort, Goodwin testified himself that it does not prevent him from engaging in any activities. Filing No. 148-4 at 41, Goodwin Depo. 155:8–18; *see also* Filing No. 1 at 19 (Aug. 11, 2017 medical chart entry noting Goodwin "has been exercising doing at least 150 burpees per day"). Goodwin's unsupported assertions that the delay in his treatment "could possibly mean permanent damage and disability" is speculative at best. Filing No. 165 at 3. Rather, all the evidence suggests Goodwin's condition is chronic, *see, e.g.*, Filing No. 21-1 at 80, as Goodwin himself acknowledges, *see* Filing No. 165 at 2. As discussed below, to the extent Goodwin claims the State Defendants failed to treat or inadequately treated his chronic pain, the undisputed evidence shows that neither Dr. Kasselman, Dr. Damme, nor Dr. Che were deliberately indifferent to his serious medical needs.

***2. Dr. Kasselman***

Goodwin claims that Dr. Kasselman was deliberately indifferent to his medical needs because Dr. Kasselman "has made it difficult to receive proper medical care, seeing patient multiple times for complaints of pain but no effort to help or address problems. . . . Also discontinuing medication thats [sic] previously prescribed by doctors for nothing relating to the medication or medical issue, but a missed appointment for blood draw." Filing No. 21 at 33. Goodwin further alleges that Dr. Kasselman discredits and has failed to address Goodwin's complaints of chronic pain and "continues to den[y] Plaintiff any pain management." *Id*. at 37–39.

Contrary to Goodwin's allegations, the undisputed evidence shows that since March 2017, Dr. Kasselman has treated Goodwin for chronic pain in his back, shoulder, and face. Filing No. 152-1 at 2, Kasselman Aff., ¶¶ 2, 9. Dr. Kasselman's medical

recommendations and treatment for Goodwin were for management of the above conditions and prevention of further progression as well as to maintain ability to perform activities of daily living. *Id*., Kasselman Aff., ¶ 11. In each of these medical appointments, Dr. Kasselman treated Goodwin to the best of his abilities based on his medical training and experience. *Id*., Kasselman Aff., ¶ 10. When Dr. Kasselman discontinued specific treatments for Goodwin, his reasons for doing so were documented and reasonable. For instance, Dr. Kasselman responded to Goodwin's June 26, 2019 Inmate Interview Request regarding why his physical therapy was cancelled when he's "still dealing with pain and daily difficultys [sic] on just walking" by stating, "On 6/1/19, you requested PT stopped as you are doing better." Filing No. 21-1 at 71; *see also Id*. at 69 (June 5, 2019 note by Dr. Damme discontinuing physical therapy per Goodwin's request).

Additionally, medical documentation between Dr. Kasselman and Goodwin also shows that the decision to end Goodwin's pain medication was premised on more than his refusal to obtain a blood draw. Goodwin's medication was discontinued by Dr. Kasselman either for behavioral issues, because of possession of other substances, or for passing and receiving. Filing No. 152-1 at 3, Kasselman Aff., ¶ 14. Dr. Kasselman's discontinuation of Goodwin's pain medication based on Goodwin's use and abuse of drugs within TSCI complied with NDCS policies and was consistent with the discontinuation of medication to inmates based on similar violations. *Id*. at 2, Kasselman Aff., ¶¶ 12–13. Goodwin himself acknowledged that a decision to restrict pain medication based on past drug abuse follows NDCS policy. Filing No. 148-4 at 30, Goodwin Depo. 110:8–111:7. Goodwin's medical records also reflect that Dr. Kasselman's decision to discontinue Goodwin's medication in December 2019 was based on Goodwin's lack of

"[c]ompliance with all medical request [which] is required for this medication" and because Goodwin's "lab refusal violated our agreement as well as compliance [with] medical." Filing No. 21-1 at 82.

Upon review of the record as a whole, the undisputed evidence establishes that Dr. Kasselman has provided Goodwin with appropriate medical treatment. Though it is not the treatment that Goodwin requests or thinks he needs, Goodwin's disagreement with Dr. Kasselman's treatment decisions does not establish a claim of deliberate indifference. While inmates have a right to adequate medical care, they have no "'right to receive a particular or requested course of treatment.'" *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). In other words, "'[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.'" *Id.* at 921–22 (quoting *Meuir*, 487 F.3d at 1118–19). The undisputed facts show that Dr. Kasselman acknowledged Goodwin's medical needs and tried to continuously treat Goodwin for those medical issues. However, Goodwin often hindered his own medical treatment by refusing to comply with orders or discontinuing treatment. Based on the record presented, the Court finds Dr. Kasselman was not deliberately indifferent to Goodwin's serious medical needs and did not violate Goodwin's Eighth Amendment rights.

***3. Dr. Damme***

Goodwin alleges Dr. Damme was deliberately indifferent to his medical needs because Dr. Damme discontinued Goodwin's prescription pain medication due to Goodwin's refusal to attend an appointment and because he believed Goodwin was

malingering and trying to get "high." Filing No. 21 at 41–42. Goodwin further alleges that Dr. Damme was aware that "Plaintiff suffered from damaged tendons" but "deliberately failed to schedule him for needed surgery for almost two years, well know[ing] that excessive delay could mean permanent disability." *Id*. at 42–43.

Like Dr. Kasselman, Dr. Damme attested that he has treated Goodwin to the best of his abilities based on his medical training and experience since he began treating Goodwin in March of 2019. Filing No. 152-2 at 2, Damme Aff., ¶¶ 7, 10. Goodwin's medical records show that Dr. Damme worked closely with Dr. Kasselman at TSCI in treating Goodwin. Dr. Damme made the initial decision to terminate Goodwin's use of the pain medication Salsalate in May 2019 based on Goodwin refusing to take the medication. Filing No. 21-1 at 69. However, Dr. Damme continued to allow Goodwin to take the over-the-counter medication ibuprofen, as well as the prescription medication gabapentin, through November 2019. *Id*. at 80. It was not until Goodwin started refusing to comply with medical requests that gabapentin was discontinued by Dr. Kasselman in December 2019, as discussed above. Dr. Damme also concurred with Dr. Kasselman's discontinuation of gabapentin based on Goodwin's history of drug abuse and misuse. *See Id*. at 84–85.

Dr. Damme also fully understood the nature of Goodwin's complaints of ankle pain and met with him multiple times to discuss the cause of that pain. Dr. Damme disagreed with Goodwin, however, as to the cause of that pain and whether additional treatment and surgery was needed to correct Goodwin's ankle issues. After years of appointments and treatment, Dr. Damme scheduled Goodwin for an X-ray on his ankle to determine if any internal damage remained that would be causing Goodwin's pain. *Id*. at 84, 86. On

January 21, 2020, Dr. Damme wrote in his report that "your recent left foot and ankle x-ray showed no acute boney abnormalities and a well healed ankle fracture. You do have part of a screw remaining within the distal tibia that is within the bone and causing no soft tissue issues." *Id*. at 88.

Goodwin has not offered evidence to create a material dispute of fact that Dr. Damme was deliberately indifferent to his serious medical needs. Rather, the record evidence demonstrates only that Goodwin disagrees with Dr. Damme's treatment decisions and diagnosis that no further surgery is needed on his ankle to resolve any remaining pain. However, this difference in opinion does not create a valid claim of deliberate indifference as discussed above. As such, Dr. Damme did not violate Goodwin's Eighth Amendment rights and Goodwin's claim against Dr. Damme fails as a matter of law.

***4. Dr. Che***

Lastly, Goodwin claims that Dr. Che was deliberately indifferent to his medical needs because he "completely ignored" P.A. Schulz's orders for physical therapy, pain medication, and a follow-up appointment and because Dr. Che discontinued Goodwin's prescription for hydrocodone after Plaintiff was found with marijuana. Filing No. 21 at 10–11, 25–26.

The undisputed material facts of this case show that Dr. Che's treatment of Goodwin did not constitute deliberate indifference to his medical needs. Dr. Che treated Goodwin approximately five times at the NSP beginning in September 2016. Filing No. 152-4 at 2, Che Aff., ¶ 4–6. Goodwin's medical records show that Dr. Che met with Goodwin to discuss his ankle pain and other medical conditions, and Dr. Che advised

Goodwin that the reason he was not going to prescribe Goodwin with new pain medication was due to Goodwin's past drug abuse. Filing No. 21-1 at 40 ("Will not start narcotics or opioids for this patient for chronic pain [because] of history of abuse of recreational substance."). Again, Goodwin himself recognized that a decision to restrict pain medication based on past drug abuse follows NDCS policy. Filing No. 148-4 at 30, Goodwin Depo. 110:8–111:7. By following NDCS policy in restricting Goodwin's access to pain medication, Dr. Che was not deliberately indifferent to Goodwin's serious medical needs particularly where the records indicate Goodwin was still receiving gabapentin for his pain complaints. *See* Filing No. 21-1 at 40 ("Will not [increase] Gabapentin [because] of history of abuse.")

Additionally, Dr. Che routinely took Goodwin's medical requests seriously and made requests for further consults with other physicians. Goodwin's medical records show Dr. Che following up via fax with P.A. Schulz to see if there were any additional treatments that he could use with Goodwin on April 24, 2017, Filing No. 21-1 at 42, and then requesting a consult with a foot and ankle surgeon to evaluate whether possible surgery is needed, *Id*. at 41. The undisputed facts regarding Dr. Che's numerous appointments with Goodwin and follow-up recommendations show that he was not deliberately indifferent to Goodwin's serious medical needs and did not violate Goodwin's Eighth Amendment rights.

***5. Summary***

The Court finds that Goodwin's claims against each State Defendant fail as a matter of law. "If the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. . . . This is not to say, however, the

defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim." *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) (citations omitted). Alternatively, because there was no constitutional violation, each Defendant is entitled to qualified immunity. *See Payne v. Britten*, 749 F.3d 697, 707 (8th Cir. 2014) ("For example, a district court could begin and end with the first question, granting qualified immunity because there was no constitutional violation.").

## V. CONCLUSION

Upon careful review, the undisputed evidence shows that Dr. Hughes, P.A. Schulz, and the State Defendants provided appropriate medical care to Goodwin. Goodwin's claims of deliberate indifference amount to nothing more than disagreements with the Defendants' diagnoses and treatment decisions, which are insufficient to establish an Eighth Amendment violation. All Defendants have acknowledged Goodwin's complaints and provided care in the exercise of his or her professional judgment. *See Allard*, 779 F.3d at 772–73 (physician was entitled to summary judgment because he did not ignore plaintiff's complaints or condition but provided care and treatment). Defendants' conduct is nowhere near the level of criminal recklessness necessary to establish deliberate indifference. *See Ryan*, 850 F.3d at 425. Accordingly, the Court grants Dr. Hughes', P.A. Schulz's, and the State Defendants' motions for summary judgment and dismisses this matter with prejudice as to these Defendants.

IT IS THEREFORE ORDERED that:

1. Plaintiff's motion for status, Filing No. 186, is granted, and this Memorandum and Order serves as notice of the status of this case.

2. Plaintiff's other pending motions, Filing No. 168; Filing No. 169; Filing No. 170; Filing No. 172; Filing No. 173; Filing No. 174; Filing No. 182, are denied for the reasons stated in this Memorandum and Order.

3. Dr. Hughes' and P.A. Schulz's Motion for Summary Judgment, Filing No. 147, and the State Defendants' Motion for Summary Judgment, Filing No. 150, are granted. Plaintiff's claims against Dr. Hughes, P.A. Schulz, and the State Defendants are dismissed with prejudice.

4. The Clerk of Court is directed to send a copy of this Memorandum and Order and the accompanying Judgment to Plaintiff at the Reception and Treatment Center, PO Box 22800, Lincoln, NE 68542-2800, and to update Plaintiff's address accordingly.

5. Judgment shall be entered by separate document generally providing:

a. Pursuant to the Court's Memorandum and Order dated June 17, 2021, Filing No. 28, (1) all claims alleged against Defendants Dr. Hughes, P.A. Schulz, Dr. Kasselman, Dr. Damme, P.A. Haith, P.A. Flinn, Dr. Hustad, Dr. Che, Dr. Kohl, Dr. Strasburger, and Dr. Samani in their official capacities, (2) Plaintiff's claim against Defendant Wendy Kars, LPN, and (3) Plaintiff's state law medical malpractice claims against Dr. Hughes and P.A. Schulz are dismissed without prejudice;

b. Pursuant to the Court's Memorandum and Order dated February 4, 2022, Filing No. 127, Plaintiff's claims against Defendants Cheryl Flinn, Gary Hustad, M.D., and Dr. Scott Strasburger in their individual capacities are dismissed without prejudice;

c. Pursuant to the Court's first-filed Memorandum and Order dated April 19, 2022, Filing No. 153, Plaintiff's claims against Defendants P.A. Haith and Dr. Kohl in their individual capacities are dismissed with prejudice;

d. Pursuant to the Court's second-filed Memorandum and Order dated April 19, 2022, Filing No. 154, Plaintiff's claims against Defendant Dr. Samani in his individual capacity are dismissed with prejudice;

e. As stated above, all other claims against Dr. Hughes, P.A. Schulz, Dr. Kasselman, Dr. Damme, and Dr. Che in their individual capacities are dismissed with prejudice.

Dated this 29th day of September, 2023.

BY THE COURT:

Joseph F. Bataillon
Senior United States District Judge